Filed 5/15/14  In re Raymond R. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re RAYMOND R. et al., Persons Coming Under the Juvenile Court Law. | B248833, B250439 (Los Angeles County Super. Ct. No. CK72880) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANITA C. et al.,<br><br>Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Amy M. Pellman, Judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant Anita C.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant Steve R.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

_____

The juvenile court adjudged minors Raymond R., born in 2001, and Michael R., born in 2005, dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect) and terminated the parental rights of Anita C. (Mother) and Steven R. (Father).[1]  Mother and Father appeal from the court's orders (1) denying without a hearing Mother's second and third section 388 petitions for modification of orders, in which she requested the minors be returned to her care, (2) granting the minors' section 388 petition for modification of an order by changing Father's visits from unmonitored to monitored visits, (3) finding the minors specifically adoptable, and (4) finding inapplicable the beneficial parental bond exception to the termination of parental rights.  They join in each other's arguments to the extent the other's arguments benefit him or her.[2]

We conclude that (1) because Mother showed, at most, changing but not changed circumstances and failed to show the proposed change of order would promote the best interests of the minors, the juvenile court did not abuse its discretion when it summarily denied the challenged section 388 petitions without a hearing, (2) because the minors had special needs, including Raymond's fetal alcohol syndrome diagnosis, which condition Father failed to understand and was unable to handle properly, the court did not abuse its discretion in granting the minors' section 388 petition for modification limiting Father's visits to monitored visits, (3) because a relative was willing to adopt the minors and it was likely the minors would be adopted within a reasonable time, the evidence supported the court's finding the minors were specifically adoptable, and (4) because Mother and Father did not occupy a parental role to the minors, who had established a close bond with the relative who wished to adopt them, the evidence supported the court's finding inapplicable the beneficial parental bond exception to the termination of parental rights. We affirm the orders.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] On November 25, 2013, we ordered consolidation of B248833 and B250439 for purposes of briefing, oral argument, and decision.

## BACKGROUND

The family involved in this case faces very serious challenges. Raymond R. was born in 2001 with fetal alcohol syndrome. Raymond also has been diagnosed with mental retardation. His brother Michael has other special needs. Mother has a history of severe alcoholism and has been diagnosed with bipolar disorder. Father also has various limitations.

### A. The detention report

On November 4, 2010, the Department of Children and Family Services (DCFS) reported the following in connection with a detention hearing before the juvenile court to determine whether the minors should be removed immediately from the care of Father, who had sole legal custody of the children at that time.

Mother and Father had a long history of referrals to DCFS beginning in 2001, the year of Raymond's birth. In 2006, a referral for emotional abuse and general neglect by Mother was substantiated and DCFS filed a petition. On May 7, 2008, DCFS removed the minors from Mother and Father's care because Mother abused alcohol, Mother had been intoxicated while the minors were in her care, and Mother had been verbally and physically aggressive toward Father. In addition, Father had been aware of Mother's alcohol abuse and aggressive behavior, but had not taken sufficient measures to protect the minors.

On June 19, 2008, the juvenile court ordered DCFS to provide family maintenance services to Father and family reunification services to Mother, including alcohol and parenting programs. Mother failed to reunify with the minors and on October 27, 2010, the court granted Father sole legal and physical custody, with monitored visitation by Mother. Father was ordered not to be Mother's monitor. The court then terminated its jurisdiction over the case.

Two days later, on October 29, 2010, DCFS received an emergency response referral that alleged drug use by Mother and Father and screaming and cursing by Mother and Father at each other and at the minors. On November 1, 2010, DCFS interviewed Raymond and Michael. Raymond stated that Mother had been living with them in the

3

family home, he knew Mother was not supposed to be staying in the home, and Mother and Father drank alcohol. Michael told DCFS that Mother had been staying with them and had gotten him ready for school that morning without a monitor present. Michael said Father and Mother had taken Raymond and Michael trick-or-treating without a monitor.

DCFS also interviewed Father, whose breath had an odor of alcohol. Father denied Mother had been living with them, but admitted suitcases filled with women's clothing in the home belonged to Mother. He stated Mother was homeless and sometimes took a shower and changed clothes in the home during her monitored visits with the minors. Father claimed that Steve E., a visitor, was the monitor. Steve E. stated he had been visiting Father for two days, but did not mention that he had monitored any visits between Mother and the minors.

Paternal half-sister Shawna R. reported that on several occasions she had gone to Father's home and observed Mother sleeping there.

On November 1, 2010, DCFS took Raymond and Michael into protective custody and placed them with Shawna.

On November 2, 2010, Mother stated the luggage at the family home belonged to her, denied staying in the family residence, and stated that Steve E. had monitored her visits. Mother admitted she had abused drugs and alcohol in the past and that she had been diagnosed with bipolar disorder.

**B. The section 300 petition**

As of November 4, 2010, Father had sole legal custody of Raymond and Michael. On that date DCFS filed a petition pursuant to section 300, subdivision (b), on behalf of both children.

As amended and sustained, paragraph b-1 of the petition alleged under section 300, subdivision (b) that Father had established a detrimental and endangering home environment for the minors by allowing Mother to spend nights in the minors' home and to have unlimited access to the minors in violation of juvenile court orders that Mother was to have only monitored visits and Father was not to be the monitor.

4

As amended and sustained, paragraph b-2 of the petition alleged under section 300, subdivision (b) that Mother had a history of alcohol abuse, which rendered her incapable of providing the minors with regular care and supervision, Mother had failed to participate regularly in a juvenile court ordered substance abuse rehabilitation program, and Mother's alcohol abuse endangered the minors' physical and emotional health and safety and created a detrimental home environment and placed the minors at risk of harm.

As amended and sustained, paragraph b-3 of the petition alleged under section 300, subdivision (b) that Mother suffered from mental and emotional problems, including bipolar disorder for which Mother was taking medication, which periodically rendered Mother incapable of providing the minors with regular care and supervision, and Mother's mental and emotional problems endangered the minors' physical and emotional health and safety and placed them at risk of physical and emotional harm and damage.

## C. The detention hearing

On November 4, 2010, the juvenile court ordered the minors detained from Father's home and granted monitored visits for Mother once a week and for Father twice a week. The court ordered family reunification services and individual counseling for Mother and Father.

## D. The jurisdiction/disposition report and adjudication hearing

On November 4, 2010, DCFS reported the following in connection with the jurisdictional and dispositional hearing, at which the juvenile court determines whether the minors shall be declared dependents and issues orders for the minors' care.

With respect to the allegations of the section 300 petition, on November 30, 2010, Father told DCFS that someone had called in a false report on him. Father could not remember why the juvenile court had ordered Mother's visits to be monitored in the previous dependency matter or why the minors had been detained in the current matter.

Mother reported to DCFS that she had been diagnosed with bipolar disorder. She admitted having had a drug and alcohol problem. She denied having a current problem with alcohol, claiming to have had her last drink three years previously.

5

During a monitored visit on November 23, 2010, among Mother, Father, the minors, and Shawna, Mother and Father gave Shawna "very dirty looks" and rolled their eyes because Shawna did not allow the minors to take home or eat the junk food that Mother and Father had brought.

Dr. Alfredo Crespo evaluated the minors and Mother. In his evaluation dated January 21, 2011, Dr. Crespo reported that Raymond had been diagnosed with mental retardation and was a client of the regional center, which coordinates services for developmentally disabled clients. Michael had a "known" history of cleft lip and palate and had been provided with speech therapy through special education services. Raymond was quiet and difficult to engage verbally, but he was consistently cooperative. Both minors blamed themselves for being removed from the home. Mother blamed Shawna for making false allegations of drug and alcohol abuse against Father because "'she's always wanting to hurt him in some way, and this time she accomplished it.'" Mother claimed she and Father currently did not use drugs or alcohol. Dr. Crespo concluded the minors were vulnerable "as a result of a history of developmental delays and a pattern of neglect and marginal living conditions while formerly in the care of their parents." Dr. Crespo reported Mother had been unable to meet the needs of the minors as a result of alcohol abuse and "a likely concomitant mood disorder." Mother appeared limited in her ability to meet her own needs. Dr. Crespo recommended the minors remain placed with Shawna and that Mother be permitted to live with Father, with monitored and documented visits to the minors to occur at a DCFS office.

At the adjudication hearing on January 25, 2011, Mother and Father signed a waiver of rights and submitted on the section 300, subdivision (b) petition. The juvenile court accepted their waivers and sustained the petition as amended.

## E. The disposition hearing, reports, and orders

In a last minute information report filed on March 1, 2011, DCFS reported that Mother and Father had been having appropriate visitation with the minors but continued to make negative comments about Shawna. Father appeared hung over and red-faced at visits.

6

At the March 1, 2011 continued disposition hearing, the juvenile court declared the minors dependents of the court and ordered DCFS to provide family reunification services. The court ordered Mother to participate in individual counseling, conjoint counseling, alcohol counseling, and random alcohol and drug testing. The court ordered Father to participate in a psychological evaluation with Dr. Crespo, individual counseling, conjoint counseling, drug counseling, and random drug testing. The court further ordered Mother and Father to attend a fetal alcohol and drug support group. The court granted Mother and Father monitored visits two times a week at the DCFS office. The court gave DCFS discretion to increase the time and duration of the visits, but ordered DCFS not to discontinue the monitor.

On April 4, 2011, Dr. Crespo reported to DCFS that he had evaluated Father and also considered the April 24, 2010 report of Dr. Lyn Laboriel, director of the LAC-USC Fetal Alcohol Spectrum Disorders Clinic, who had been working with Father and the minors since 2008. Dr. Laboriel's report stated that although Father loved the minors, he lacked the ability to raise the minors and to address their serious special needs, Father was in denial about Raymond's fetal alcohol syndrome diagnosis and Michael's suspected fetal alcohol syndrome diagnosis, Father had serious cognitive limitations that made it difficult, if not impossible, for him to understand the minors' difficulties and to comply with recommended interventions or follow through with care at home, and Father had limited problem-solving and planning abilities.

Dr. Crespo reported that, when asked whether Raymond or Michael had any special needs, Father replied that the minors had been diagnosed with fetal alcohol syndrome, but "'every time I argue it, I get yelled at . . . so I keep my mouth shut. I have my own opinion." Father believed the boys were "'normal kids.'"

Dr. Crespo reported that Father was in denial about the minors' special needs and that Father blamed reports that he lacked parenting skills on alleged sexual advances made toward him by an in-home counselor, which had "no basis [in] reality." Dr. Crespo concluded the minors would be at risk of neglect if they were returned to Father's care. Dr. Crespo stated, "[I]n light of [Mother's] history of severe alcoholism, and [Father's]

7

various limitations to understand, and accept, the minors Special Needs, neither parent, in my opinion, are likely to imminently gain sufficient parenting skills to be able to provide their vulnerable children with the care these children obviously need."

**F. Mother's first section 388 petition, the hearing on the section 388 petition, and subsequent reports**

On July 15, 2011, Mother filed a section 388 petition requesting that the juvenile court change its order of monitored visits to unmonitored and overnight visits. The petition stated that Mother was in full compliance with the case plan, the minors were bonded to her, and the minors would enjoy more liberal visitation.

Attached to the petition was a letter dated May 17, 2011, from El Centro Del Pueblo showing Mother had participated in 17 individual counseling sessions since July 2010 and indicating that Mother was beginning to "implement useful tools" and "has begun to acknowledge responsibility in causing emotional harm to her children [but] still needs to resolve conflicts of the spouse in order to better parent their children." Mother also attached to her petition a letter from the Department of Mental Health dated February 28, 2011, stating that Mother had begun receiving services on December 24, 2009, had been diagnosed with bipolar disorder, and had been prescribed psychiatric medication. The petition also included a letter dated June 14, 2011, from El Centro Del Pueblo, stating that Mother had completed a six-month alcohol and drug program and a letter dated April 20, 2011, from El Centro Del Pueblo, stating that Mother had been enrolled in an alcohol and drug outpatient program since November 16, 2010.

On August 26, 2011, DCFS reported that Mother had enrolled in individual therapy on July 27, 2010, and had attended 17 sessions. By June 14, 2011, Mother had completed a six-month drug and alcohol program. However, Mother had tested positive for amphetamines and methamphetamine on May 9, 2011, and for opiates and hydrocodone on July 20 and August 8, 2011. Mother had been receiving outpatient services at the Department of Mental Health since December 4, 2009. Mother had not yet enrolled in a fetal alcohol syndrome support group. Father had enrolled in a drug and

8

alcohol program on March 4, 2011, which he completed on September 6, 2011.  Father had not yet enrolled in a fetal alcohol syndrome support group.

On November 7, 2011, DCFS reported that "Mother has tested positive for drugs three times in the past months and has not completed all of her court ordered programs. The father has several no-show drug and alcohol, test results in the past months and has not completed all of his court ordered programs as well."

The juvenile court denied Mother's section 388 petition at the November 7, 2011 hearing, but gave DCFS discretion to grant each parent up to two hours of unmonitored visits with the minors.

According to a DCFS report dated February 28, 2012, Mother and Father began couples counseling in July 2011, and Mother completed a fetal alcohol syndrome support group program on December 7, 2011.  Mother had continued to drug test randomly, and the results had been negative for drug use.  Mother had not yet completed domestic violence support group counseling.

Father completed a drug and alcohol program on September 6, 2011, enrolled in an "aftercare" drug and alcohol program on October 26, 2011, and completed a fetal alcohol syndrome support group program on November 7, 2011.  Father also continued to submit to random drug testing, with negative results.

The minors continued to do well in Shawna's home.  Their acting out behavior had decreased significantly.  They participated in after school activities such as basketball, softball, and dance.

At a review hearing on February 28, 2012, the juvenile court found that Mother and Father had consistently and regularly visited with the minors, had made significant progress in resolving the problems that had led to the minors' removal, and had demonstrated the ability to complete the treatment plan and provide for the minors' safety, protection, physical and emotional well-being, and special needs.  In addition to monitored visits, the court granted Father two hours of unmonitored visits for the first two weeks after the hearing, four hours of unmonitored visits for the second two weeks, six hours of unmonitored visits for the third two weeks, and eight hours of unmonitored

visits for the fourth two weeks. The court gave DCFS discretion to lift the monitor on Mother's visits for two hours per week as long as the minors' counsel agreed. The court ordered DCFS to make unannounced visits during Mother's and Father's unmonitored visits with the minors.

In its subsequent report on April 24, 2012, DCFS reported that on February 13, 2012, and February 29, 2012, Mother failed to appear for her drug tests and did not provide any documentation to explain why she did not appear.

The report also stated that on April 22, 2012, Father became furious and used foul language when the minors wanted to play with their friends instead of visiting Father at a park. Raymond told DCFS that he did not want to visit Father because Father was yelling. Raymond stated that Father had screamed at him on the telephone and then hung up on him. Raymond reported that he felt a little sad. He stated, "'I want to live with my mom and dad but they need more classes and medication pills to calm down.'" Michael stated that he had not wanted to visit Father because he wanted to go to his friend's house and because Father "was angry." Michael stated he was afraid that Father was going to use bad words and hit a bus stop sign, like he had previously. Michael stated, "'Sometimes I am sad because I want to go with my mom and dad. . . He (father) was acting bad yesterday. . . Mom and dad were fighting and saying bad words. . . The F-word and the B-Word. . . If they (Mother and Father) are going to say bad words I would rather live with Shawna.'"

The report further stated that on April 23, 2012, Mother and Father were asked to leave a team decision-making meeting (TDM) because they raised their voices in an aggressive manner and refused to follow directions.

In a last minute information report filed on June 12, 2012, DCFS stated that on May 31, 2012, the minors were placed in Father's home for an extended two-week visit after Shawna's brother, C.H., accidentally fractured Raymond's wrist while home from a college visit and Shawna failed to take Raymond for a follow-up medical appointment for that injury.

10

In a last minute information report filed on June 18, 2012, DCFS reported that on June 13, 2012, Raymond told DCFS that he wished to live with Shawna because she took care of him and Michael, he had his own room in her home, he loved Shawna, Shawna was nicer to him than Father, and "'[s]ometimes my dad gets mad at me and says bad words.'" Raymond said Father's home was too small, he could not play or jump around, and sometimes he got bored there. Raymond reported Father told Michael that he was dumb. Raymond told DCFS he wanted to live with Shawna during the week, and then stay with his parents on the weekends. He said he did not want to hurt Mother's and Father's feelings. Michael told DCFS he wished to live with Shawna because she was nicer to him and Raymond than Father, Shawna took care of them, and Shawna gave them healthy things to eat. Michael's teacher told DCFS that Michael had missed several homework assignments during the time the minors had their extended visit with Father.

In a report dated September 4, 2012, DCFS reported the minors had been placed back into Shawna's home.

Raymond had told his therapist Father had not fed him dinner because he did not have any money for food. The report also stated that on July 25, 2012, Mother had enrolled in a drug and alcohol program, but Mother had tested positive for methamphetamine on August 2, 2012. Mother and Father's couples therapist reported Father had no insight into his anger issues and "did not know why" the minors had been removed from his care. Father did not take responsibility for his actions and blamed "the system" for his involvement with DCFS and the court. DCFS reported that although Mother and Father complied with court-ordered programs and services, they had not been able to manage and control their anger.

On November 14, 2012, the juvenile court found that Mother and Father were not in compliance with the court's orders, that return of the minors to their care would create a substantial risk of detriment to the minors' physical and emotional well-being, and that there was no substantial probability that the minors would be returned to Mother and Father's care within six months. The court terminated family reunification services, set

11

the matter for a section 366.26 hearing to select and implement a permanent plan, and ordered that Raymond and Michael remain placed in Shawna's home.

## G. Mother's second section 388 petition

On March 1, 2013, Mother filed a second section 388 petition requesting modification of the juvenile court's orders terminating family reunification services and requiring that the minors remain suitably placed with Shawna. The second section 388 petition requested that the minors be placed with Mother. It stated Mother had continued to comply with the case plan, Mother had attended individual counseling twice a week and couples counseling with Father once a week, Mother had enrolled in a drug program in October 2012, Mother had attended Narcotics Anonymous and Alcoholics Anonymous meetings, Mother had a sponsor, Mother had tested negative for drugs on 22 occasions since August 6, 2012, and Mother was compliant with her mental health treatment and medication. The second section 388 petition urged the modification would be in the minors' best interest because Mother showed a commitment to being sober and healthy, Mother was participating in services to address the case issues, Mother was able to provide the minors with a safe home, and Mother visited the minors regularly.

In support of her petition, Mother attached a letter dated February 15, 2013, from an agency called DAZ Foundation that stated that since January 2, 2013, Mother had attended two individual therapy sessions per week and one conjoint couples therapy session with Father per week. The letter stated Mother took responsibility for her actions and during couples counseling, Mother and Father openly discussed their relationship, roles as parents, and their future.

Mother attached a letter from the Department of Mental Health dated February 21, 2013, that stated Mother had been provided with outpatient mental services since December 24, 2009, had been diagnosed with bipolar disorder, and had been treated with medication and case management services. The letter reported Mother had sought assistance by calling or coming in person to the program.

Mother attached a February 22, 2013 letter from an agency called Plaza Community Services stating Mother had attended three group sessions and three

12

Narcotics Anonymous/Alcoholics Anonymous meetings a week. Mother had one unexcused no-show for group sessions. The letter advised that Mother also met with her primary counselor for individual substance abuse counseling once a month and agreed to submit to random drug testing one time a week. Mother's expected completion date of the program was July 25, 2013.

Mother also attached what appears to be a handwritten log by Mother of "phone visits" by Mother to the minors.

## H. The minors' section 388 petition and subsequent reports

On March 7, 2013, the minors filed a section 388 petition for modification of the juvenile court's February 28, 2012 order granting Father unmonitored eight-hour weekend visits and monitored visits for Mother. The petition requested that the court order all of Father's visits to be monitored, or alternatively, that the court order Father's weekend visits to take place between 9:00 a.m. and 5:00 p.m. The petition requested that DCFS or the monitor transport the minors to and from the regularly scheduled monitored visits during the week. The petition reported that, since the last court hearing, Father consistently returned the minors to Shawna's home well after dark, one to two hours late, and that Mother had verbally attacked Shawna. The petition stated the proposed modification was in the minors' best interest because under the proposed modified order, the minors, "one of whom is medically fragile, will not be exposed to the cold, night air." The petition also stated that under the proposed modification, the minors would not be exposed to confrontations between Mother and Shawna.

Attached to the petition for modification was a declaration from Shawna stating Father had been permitted 8-hour unmonitored visits which were scheduled on Sundays from 10:00 a.m. to 6:00 p.m. Father consistently picked the minors up late, often around 11:00 a.m. or noon, and returned them home late, "sometimes as late as 7:45 or 8:00 p.m." Father kept the minors out well after dark and did not notify Shawna when he was going to be late. Michael suffered from health problems that were exacerbated by the cold night air. Shawna's declaration stated, "[Michael] is particularly prone to ear infections due to his cleft palate. Father does not own a car, and so the children spend

13

most of their visits outside. When Michael is out late into the evening, his health is jeopardized. Both children are recovering from the flu, and Michael has a cough that I believe has lasted longer than necessary due to exposure to the cold, night air."

Shawna's declaration stated that on January 4, 2013, at a regularly scheduled monitored visit with Mother and Father, with a DCFS social worker present, Shawna had asked Father to let her know if he was going to bring the children back late. While the minors were in Shawna's car, Mother began to yell at Shawna, insulted her, and criticized the way she handled the minors. Father remained quiet while Mother yelled at Shawna. Shawna then terminated the visit and drove the minors home.

Shawna declared she had contacted the DCFS social worker repeatedly regarding Father's tardiness. Although the social worker assured Shawna she would speak to Father, nothing had changed. Further, on February 3, 2013, Father returned the minors home an hour and 35 minutes late, which was more than an hour after sundown. Michael continued to suffer from a persistent cough. Shawna stated she had contacted DCFS at least five times with regard to that incident and Father's tardiness.

## I. The summary denial of Mother's second section 388 petition

On March 13, 2013, the juvenile court denied Mother's second section 388 petition without a hearing, stating, "The 388 does not show a change of circumstances enough to show a warrant for a hearing." Mother's counsel argued that the documentation attached to the petition showed that Mother had been in compliance with the case plan. In response, the juvenile court stated, "I don't see visits. I don't see real visits. I see somewhat alleged to be phone visits, but I can't really tell what those are from your documents, counsel. . . . It doesn't appear that the Mother has been regularly visiting with the children, number one. [¶] Number two, it appears that the Mother is only just starting compliance in January, and that's what the letters indicate."

The juvenile court then scheduled an April 4, 2012 hearing date on the minors' section 388 petition and stated that its tentative decision was to require Father's visits to be monitored. Father's counsel denied that Father returned the minors home late from visits. Upon Mother's and Father's counsels' request, the court reviewed DCFS's service

14

log but found the entries to be irrelevant. The court ordered Father's eight-hour unmonitored visits to be suspended until the hearing on the minors' section 388 petition. The court ordered Father to have monitored visits during the week.

## J. Mother's third section 388 petition

On March 29, 2013, Mother filed a third section 388 petition for modification of the juvenile court's order terminating family reunification services. The third section 388 petition requested that the court order the minors placed in Mother's care or, in the alternative, that the court order unmonitored visits for her. As in her second section 388 petition, the third section 388 petition stated that Mother had continued to comply with the case plan, Mother had attended individual counseling twice a week and couples counseling with Father once a week, Mother had enrolled in a drug program in October 2012, Mother had attended Narcotics Anonymous and Alcoholics Anonymous meetings, Mother had a sponsor, and Mother had complied with her mental health treatment and medication. Also, Mother had tested negative for drugs on 25 occasions since August 6, 2012. As in her second section 388 petition, the third section 388 petition urged the modification would be in the minors' best interest because Mother showed a commitment to being sober and healthy, Mother was participating in services to address the case issues, Mother was able to provide the minors with a safe home, and Mother visited the minors regularly.

In support of the third section 388 petition, Mother attached the same letters from the Department of Mental Health, DAZ Foundation, and Plaza Community Services that she had attached to the second section 388 petition. Mother also attached letters dated February 6, 2012, April 9, 2012, and June 15, 2012, from El Centro Del Pueblo which described Mother's and Father's progress in individual and couples counseling. The June 15, 2012 letter described Father as becoming "distracted with obstacles arising within his partnership with DCFS and often lets his frustration with the system derail his focus on his children during our counseling sessions" and recommended that "both parents would benefit from continued work in individual therapy to ensure their ability to take care of their children in a positive manner."

15

Mother also attached her own declaration that stated that she had continued to comply with the court ordered case plan even after the court terminated reunification services on November 14, 2012, she had telephonic contact with the minors, and she had visits with the minors during which they played basketball, tennis, swam, and ate dinner together.

## K.  Section 366.26 report

In a section 366.26 report dated March 13, 2013, DCFS stated that a "Concurrent Planning Assessment" had been completed.  It recommended adoption by Shawna as the appropriate plan for the minors.  Shawna was described as in good health, having a high school degree and some college education, employed, residing in a spacious six-bedroom house with relatives who had no criminal records, and as having demonstrated that she had the capacity to meet the minors' needs.  DCFS indicated that the adoption home study for Shawna was "well underway but not yet completed."  Shawna stated that her adult brother, who lived in the home with her, would submit to a live-scan by the end of the week.  DCFS also reported that documentation was needed regarding another adult sibling who lived in the home and had a mental health diagnosis.  Shawna told DCFS that she "was not going to risk her home study being denied because of him" and that she had paperwork from the clinic where that adult sibling had been treated.  The paperwork was to be "pick[ed] up" by DCFS.  DCFS concluded that "[a]t this time adoption remains the most appropriate plan for the children Michael and Raymond [R.]  The adoptive applicant, [Shawna], has been very cooperative and motivated to complete the home study.  The children have been placed with [Shawna] since 11/01/2010; however, she has had a relationship with the children since they were infants."  DCFS requested that the hearing be continued for 90 days "to further assess and complete the adoption home study."

A subsequent report dated April 4, 2013, attached a letter dated March 19, 2013, from Raymond's therapist that stated that, after spending a year with Shawna,"[u]pon being returned to Father's custody, [Raymond] became extremely depressed, not as talkative, and constantly worried.  [Raymond] verbalized his worry for food, money, and

16

living in Father's home due to the size and not having a backyard. Upon being returned to [Shawna], [Raymond's] anxiety subsided and a more consistent and structured environment was put in place. [Raymond] became calmer and more verbal during sessions. [¶] . . . [¶] Most recently, [Raymond] has expressed feeling relieved that he no longer 'has to have visits' with Father all day on Sundays. He has appeared mostly apathetic in regards to visits with his parents in general and has expressed that 'they don't do much together.' [Raymond] appears to be in a calmer, more compliant mood when visits have been canceled or postponed."

## L. The summary denial of Mother's third section 388 petition and the hearing on the minors' section 388 petition

On April 4, 2013, the juvenile court denied Mother's third section 388 petition without a hearing, finding that it failed to state any new evidence or change in circumstances.

The juvenile court then proceeded with the hearing on the minors' section 388 petition. Father testified that on the only occasion he had returned the minors late, he had notified DCFS that he was taking the bus and was running late. Father explained that he had not called Shawna to let her know he was going to be late because there was "a no contact order." Father testified he had canceled a visit on one occasion because of bad weather. He also stated he had brought clothing for the minors on some visits. He stated, "And if they come down the hill where I meet them, I send them back up to the house up to my mom's house where they are staying to get some sweats or a jacket and that's about it." Father denied that he had ever engaged in a verbal altercation with Shawna in front of the children. Father also stated Mother had never engaged in an altercation with Shawna. In response to the question of whether he knew what diagnosis the minors had, Father stated the minors had been diagnosed with fetal alcohol syndrome and "it most likely came from a hereditary gene from one of the parents." When asked whether Father believed that fetal alcohol syndrome came from a hereditary gene, Father stated, "It's highly possible. It's just that the funding for the research hasn't been met yet, and it hasn't been actually pinpointed, but it's highly likely."

17

When asked whether anyone had explained to him that fetal alcohol syndrome was the result of exposure by the fetus to alcohol in the womb, Father stated, "Not necessarily. See, like I said, again, I'll tell you one more time: the research hasn't been completely done because of funding. So you've got to understand that. Until that's done, then we can talk about it more clearly." Father testified Mother had had a problem with alcohol, but to the best of his knowledge, she had not used alcohol when she had been pregnant with the minors.

The juvenile court stated Father's testimony that he had returned the minors home late on only one occasion was not credible, and "it appears that Father does not understand the special needs of his children." The court granted the minors' section 388 petition, finding that the minors would be at risk of harm if they were left unmonitored with Father for eight hours. The court ordered that Father's visits be monitored and up to four hours a week. The court then continued the matter to June 6, 2013, for the section 366.26 hearing.

On April 4, 2013, Mother filed a notice of appeal challenging the juvenile court's orders made on March 13, 2013, and April 4, 2013, denying her second and third section 388 petitions for modifications without a hearing. Father also filed a notice of appeal challenging the court's orders made on those dates.

## M. The section 366.26 hearing

The juvenile court held the contested section 366.26 hearing on June 6 and 7, 2013.

Mother testified that she had monitored visits with the minors for two hours on Mondays and Wednesdays, and since January 2013, she had not missed one visit. The visits took place at a park. During the visits, the family played sports and ate meals together. Mother stated she and the minors talked about how they were doing in school, but otherwise they did not talk very much during the visits. The minors called Mother "Mom," ran to Mother and Father at the beginning of the visits, and seemed sad at the end of the visits. Mother did not talk to the minors between visits because Shawna "won't give us any calls." Mother did not leave any telephone messages on Shawna's

18

voicemail because when she had left messages previously, Shawna had not returned her telephone calls. Mother did not know why her visits with the minors were still monitored, and she said the DCFS social worker never gave her a direct answer when she asked. Mother stated she had not taken drugs or alcohol since July 2011. Mother then admitted that she had relapsed and tested positive for methamphetamine on August 22, 2012. Mother testified she had had a drug problem for only two years. Mother testified the drug program she was currently attending was the first drug program in which she had participated, but upon questioning, acknowledged that she had been enrolled in another program before her relapse in August 2012. Mother did not remember when, why, or how old the minors were when they were first removed from her care. Mother did not remember Raymond's diagnosis, Mother did not know the name of Raymond's primary pediatrician, and Mother had not taken Raymond to any doctor's appointments or asked to accompany him to appointments. Mother and Father were still in a relationship.

Father testified he and Mother visited the minors on Mondays and Wednesdays for two hours and then attended Michael's sports games on Thursdays and Saturdays. Father also had eight-hour unmonitored visits with the minors during which they ate, rode their bikes, and went to the skateboard park where they "were free." Father also helped the minors with their homework on Mondays and Wednesdays. On occasion, Father had brought extra clothes for the minors or sent them back to the house for more clothes. Shawna had never invited Father to attend any of the doctors' appointments or school activities. Although he was invited by DCFS to attend the medical appointments and school activities, he did not go because the previous hearing officer "protected me by giving me a stay-away order for both of us. Okay. Because there's been things in the past where things were just made up. Okay." Father also did not have any telephone calls with the minors because "it's a stay-away order for my protection." Father testified that the minors had been returned to his care for two weeks and were removed when it was determined that the fracture Raymond had sustained had occurred accidentally at Shawna's house. During the two weeks the minors were in his care, Father provided for

19

the minors by bathing them, taking them to school, and helping them with their homework. Father stated Raymond had been diagnosed with fetal alcohol syndrome, but had been cured. Father testified fetal alcohol syndrome can be caused when the mother drinks alcohol while pregnant, or by a "hereditary gene."

Raymond's therapist, Michelle Dadoun, testified that immediately after visits with Mother and Father, Raymond was upset, quiet, and anxious. Raymond did not display those behaviors at sessions that were not preceded by visits with Mother and Father. Dadoun opined that Mother and Father were unable to maintain a structured and consistent environment because when Raymond lived with them, he failed to get his homework done. She also stated that Raymond seemed indifferent to the prospect of not seeing Mother and Father again if Shawna adopted him.

Raymond testified he visited with his parents on Mondays and Wednesdays. During the visits, he ate snacks, sometimes did his homework, and played basketball, soccer, and tennis. He enjoyed the visits. Raymond stated he would be "a little bit sad" if he could not see Father on Mondays and Wednesdays anymore. Raymond stated he did not know if he wanted to continue to have a relationship with Father. When asked if he remembered living with Father, Raymond answered, "I don't know." He said he would feel sad if he could not visit Mother and stated he would like to see her more. When asked whether he wished to be adopted by Shawna, Raymond replied, "I don't know." Raymond testified that when he was sad about something, he would want to talk to Shawna. He also "sometimes" spoke to Mother when he was sad or had problems in school.

Michael testified he enjoyed the visits with Mother and Father and he wished to continue having visits with them.

Counsel then made closing arguments.

The juvenile court continued the matter and on reconvening, stated that it adopted the "statements of facts and minors' counsel's brief." It observed Raymond and Michael had been involved in the dependency system since they were six and three years old, respectively, and at the time of the hearing, they were eleven and eight years old. The

20

court then addressed the issues of the minors' adoptability, observing that "generally adoptable" children have characteristics such as age, behavior, and personal appearance that "make it likely that a prospective adoptive family will be located in a reasonable time regardless if they have already been found." The court noted that when a child is considered unadoptable due to age, poor physical health, disability, or emotional instability, the child may be "specifically . . . adoptable" because a prospective adoptive family has been identified and is willing to adopt the child. The court stated, "In this case, both children do have some special needs. Raymond is diagnosed with mild mental retardation. He has features of F.A.S. Fetal Alcohol Syndrome and both children have [individualized education programs] and both children are receiving mental health counseling . . . . Both brothers are good looking and affable and have done remarkably well in the care of their adult sister . . . . [¶] Their sister [Shawna] is committed to adopting the boys. Thus the court finds by clear and convincing evidence that these children are specifically adoptable."

With regard to whether Mother's and Father's relationship with the minors rose to the level to satisfy the beneficial relationship exception to termination of parental rights, the juvenile court stated, "Father and the children testified that during most recent monitored visits, as well as their unmonitored visits, they engaged in the following activities basketball, soccer, and tennis. The older child does not remember ever living with the Father. He did say that he would be a little sad if his visits stopped, and he couldn't see his parents anymore. [¶] He stated that if he has a problem . . . he goes to his caregiver and prospective adoptive parent, his sister. All of the reports in the evidence indicates that he is thriving in his sister's home as is his little brother . . . ." The court stated Father spent his time playing with the minors, riding their bikes, and skating, and Father said "they were quote, unquote, free." The court noted there was "no doubt that the parents loved the minors." It stated that Mother's testimony was confusing and disorganized, her issues with sobriety were ongoing, and she was continuing her relationship with Father. It noted the minors' therapists' reports stated that Mother and Father acted inappropriately during joint meetings, Father continued to have anger

21

management issues, and Father "continue[d] not to understand Raymond's special needs as evidenced by his testimony that fetal alcohol syndrome is a genetic disorder; and that [Raymond] is cured even though [Father] did go through extensive training." The court stated that Mother and Father availed themselves of programs but were not "taking in the information."

The juvenile court found that, while the parents consistently visited the minors and were loving to them, they did not act in a parental role, but acted as friends or a favorite family member. The court noted that the minors did not look to Mother and Father when they were sad or needed help. The court found inapplicable the exception to termination of parental rights based on the existence of a beneficial parental bond. Consequently, the juvenile court terminated Mother's and Father's parental rights.

Mother and Father appeal from the order terminating parental rights.

## DISCUSSION

### A. The juvenile court did not abuse its discretion by summarily denying Mother's second and third section 388 petitions without a hearing

Mother contends she presented prima facie evidence to support evidentiary hearings on her second and third section 388 petitions and therefore the juvenile court's summary denial of the petitions was an abuse of discretion. We disagree.

Section 388, subdivision (a)(1) states in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." Section 388, subdivision (d) provides: "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held and shall give prior notice . . . ."

"[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) We review the juvenile court's order for abuse of discretion. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Changed, not changing, circumstances must be demonstrated. (*Ibid.*)

We conclude the juvenile court did not abuse its discretion by summarily denying Mother's second and third section 388 petitions without a hearing. Our review of Mother's second and third section 388 petitions shows she made general, conclusory allegations which failed to establish a prima facie showing of changed circumstances or that the proposed change of order would promote the best interests of the minors. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)

### 1. *The second section 388 petition*

#### a. *Mother failed to establish changed circumstances*

The second section 388 petition alleged Mother had continued to comply with the case plan, attended individual counseling twice a week and couples counseling with Father once a week, enrolled in a drug program in October 2012, attended Narcotics Anonymous and Alcoholics Anonymous meetings and had a sponsor, tested negative for drugs on 22 occasions since August 6, 2012, and was compliant with her mental health treatment and medication. However, as we explain, Mother alleged, at best, changing but not changed circumstances.

We first note that, although Mother had been provided family reunification services, including alcohol and parenting programs, Mother had been unable to reunify with the minors in the prior dependency case, and Father had been granted sole legal and physical custody of the minors in October 2010.

With respect to the current dependency matter, Mother continued the same pattern of enrolling in programs but subsequently failing to control her anger and drug issues.

23

The minors were removed from Mother and Father's care on November 1, 2010. Mother completed a drug and alcohol program in 2011, but tested positive for amphetamines and methamphetamines on May 9, 2011. After the juvenile court conducted a hearing on and denied Mother's first section 388 petition filed on July 15, 2011, Mother failed to appear for two drug tests in February 2012. Father and Mother fought and used profanity on April 22, 2012, when the minors did not want to visit Father. On April 23, 2012, Mother and Father had to be asked leave a TDM after raising their voices in an aggressive manner and failing to follow directions. Mother enrolled in a drug and alcohol program on July 25, 2012, but tested positive for methamphetamines one week later on August 2, 2012.

On November 14, 2012, the juvenile court terminated family reunification services.

Nonetheless, Mother contends that the attachments to the second section 388 petition demonstrate that she was "successfully engaging in services addressing her mental health issues, anger management and substance abuse." Given her long history of relapse and inability to reunify, the juvenile court could well have concluded that Mother had demonstrated, at best, changing but not changed circumstances. Because her last positive drug test was on August 2, 2012, Mother had been sober for only seven months at the time the second section 388 petition was filed on March 1, 2013. The letter from DAZ Foundation stated that Mother had started individual and couples therapy on January 2, 2013, a mere two months before the filing of the second section 388 petition. The court also could have concluded that two months of counseling did not establish changed circumstances. Moreover, the handwritten notes attached to the second section 388 petition appeared to be "phone visits," rather than regular, monitored visits and do not establish a change in circumstances.

This case is not like *In re Aljamie D*. (2000) 84 Cal.App.4th 424, cited by Mother, where the appellate court held that the juvenile court erred in summarily denying without a hearing the mother's section 388 petition requesting a 60-day trial visit. In that case, the appellate court held that the mother had made a prima facie case of changed

24

circumstances in that she had tested clean in weekly random drug tests for over two years, had completed numerous educational programs and parenting classes, and had visited consistently with the children and continued to have a strongly bonded relationship with them. (84 CalApp.4th at p. 432.) Additionally, the mother showed that the best interests of the minors would be advanced by the proposed modifications because the minors had repeatedly made clear that their first choice was to live with their mother. (*Ibid*.) Here, although Mother had completed educational programs and parenting classes, as noted by the juvenile court, she did not seem to be "taking in the information." In addition, Mother could show only seven months of sobriety after the minors had been removed for two and one-half years, Mother had a long history of relapse, and Mother continued to show episodes of anger. Moreover, as noted below, the minors stated they preferred to live with Shawna.

We conclude that Mother failed to establish a change in circumstances.

### b. *Mother failed to establish the proposed change in order was in the best interests of the minors*

Mother also was required to make a prima facie showing that the best interests of the minors would be promoted by placing them in her custody. We determine that the juvenile court did not abuse its discretion by concluding that she did not make such a prima facie showing.

"In order to be entitled to a hearing on a petition for modification, a parent must show changed circumstances and it must appear that the best interests of the child may be served by a change in the order. (§ 388; Cal. Rules of Court, rule 1432(c).)" (*In re Aljamie D*., *supra*, 84 Cal.App.4th at p. 432.) "Although the specific factors a court must consider vary with each case, each child's best interests would necessarily involve eliminating the specific factors that required placement outside the parent's home [citation], here, Mother's drug addiction." (*In re Angel B*. (2002) 97 Cal.App.4th 454, 463–464.) Additionally, the goal of assuring stability and continuity is taken into consideration when determining the child's best interest. (*Id*. at p. 464.)

The second section 388 petition alleged that Mother showed a commitment to being sober and healthy, Mother was participating in services to address the case issues, Mother was able to provide the minors with a safe home, and Mother visited with the minors regularly.

At the time the second section 388 petition was filed, the minors had been removed from Mother's care for two and a half years after an unsuccessful attempt to liberalize visits with Mother and Father in February 2012 and an extended visit with Father in September 2012. Although Mother behaved appropriately for the most part on her visits with the minors, they were often exposed to her cursing and fighting with Father and Shawna. Mother had never assumed a parental role to the minors after they had been removed from her care. She had not taken them to the doctor or to school or participated in school conferences. Rather, Shawna provided primary care for the minors. At the time the second section 388 petition was filed, the minors stated that they wanted to live with Shawna, who gave them healthy food and took care of them, and they reported being disturbed by the fighting and profanity used between Mother and Father. The minors were thriving under the loving and supportive care of Shawna, who wished to adopt them. We conclude that Mother has not shown how the minors' best interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future.

Because the minors are placed with a relative, it is unlikely that Mother will be deprived absolutely of a relationship with the minors.

Mother failed to establish a prima facie showing of both a change of circumstances and that a change of order would be in the best interests of the minors.

Accordingly, we conclude that the juvenile court did not err by denying Mother a hearing on her second section 388 petition.

*2. The third section 388 petition*

***Mother failed to establish changed circumstances and that the proposed change in order was in the best interests of the minors***

Mother's third section 388 petition was virtually identical to the second section 388 petition. The only difference was that, in addition to the same letters from the Department of Mental Health, Daz Foundation, and Plaza Community Services that were attached to the second section 388 petition, Mother attached her own declaration and letters dated February 6, 2012, April 9, 2012, and June 15, 2012, from El Centro Del Pueblo. The third section 388 petition also alleged that Mother had had two additional negative drug tests since the second section 388 petition was filed.

Mother's declaration stated she had continued to comply with the court-ordered case plan even after the juvenile court terminated reunification services on November 14, 2012, she had had telephonic contact with the minors, and she had had visits with the minors during which they played basketball, tennis, swam, and ate dinner together. However, her declaration did not provide new information regarding changed circumstances. Moreover, the June 15, 2012 letter from El Centro Del Pueblo advised that "both parents would benefit from continued work in individual therapy to ensure their ability to take care of their children in a positive manner." We conclude that Mother's declaration, the negative drug tests, and the letters from Mother's drug and alcohol counselor and therapist demonstrated, at most, changing but not changed circumstances.

We also conclude that for the same reasons stated in part A.1.b., *ante*, Mother failed to show that a change in order was in the best interests of the minors.

Accordingly, the juvenile court did not abuse its discretion when it denied Mother's third section 388 petition without a hearing.

**B. The juvenile court did not abuse its discretion in granting the minors' section 388 petition**

Mother and Father urge that the juvenile court abused its discretion when it granted the minors' section 388 petition for modification of an order by changing

Father's visits from unmonitored to monitored visits. We disagree. Because the minors had special needs, including Raymond's fetal alcohol syndrome diagnosis, which condition Father failed to understand and was unable to handle properly, we conclude that the court did not abuse its discretion in granting the minors' section 388 petition for modification limiting Father's visits to monitored visits.

"At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*) "This determination [is] committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Id.* at p. 318.)

""""[I]ssues of fact and credibility are questions for the trier of fact.""" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1259.)

The minors established that circumstances had changed after the juvenile court granted Father unmonitored visits and that the proposed change in order was in the best interests of the minors. In support of the minors' section 388 petition for modification, Shawna declared that Father's unmonitored visits had been scheduled on Sundays from 10:00 a.m. to 6:00 p.m., but Father was consistently late in picking them up and returned them well after dark, sometimes as late as 8:00 p.m. And because Father did not own a car, the visits occurred outdoors. She stated that Michael was prone to ear infections due to his cleft palate, and that both minors had been recovering from the flu. Shawna raised the possibility that Michael's health problems were exacerbated by the cold night air and

28

he had a cough that had lasted longer because of that exposure. Shawna stated that she had called DCFS and left a voice mail every time Father had been late. She also stated that she had contacted DCFS at least five times with regard to the incident where Mother had yelled at Shawna when Shawna asked Father to tell her if he was going to return the minors late. Accordingly, Shawna's declaration established that when Father's visits were not monitored, he kept the minors out late, resulting in the possible attenuation of Michael's colds and ear infections.

The juvenile court acted well within its discretion when it found not credible Father's testimony that he had returned the minors late on only one occasion and that neither he nor Mother had ever engaged in a verbal altercation with Shawna. Father's testimony that he believed that fetal alcohol syndrome was inherited rather than caused by prenatal exposure to alcohol supported the court's conclusion that Father did not understand the minors' special needs.

On appeal, Father asks us to reweigh the evidence by pointing to Mother's "visitation log" that he claims shows that Father conducted visits that lasted between 9:00 a.m. or 10:00 a.m. to 5:00 p.m. or 6:00 p.m., by claiming Shawna's declaration alleged only one occasion of tardiness, and by pointing to weather records showing that on one day in February 2013, the temperature was between 60 and 64 degrees at 6:00 p.m. We cannot reweigh the evidence. The court was entitled to determine that Father's testimony and Mother's visitation log lacked credibility and Shawna's declaration was credible. We reject Father's arguments that the minors could not have been exposed to cold air because they traveled with Father in a warm bus and that colds and ear infections cannot be exacerbated by exposure to cold air.

Accordingly, the minors provided substantial evidence supporting the juvenile court's conclusion that circumstances had changed and the proposed modification was in the best interests of the minors. We conclude that the court did not abuse its discretion in granting the minors' section 388 petition.

29

**C.  Substantial evidence supported the juvenile court's determination that the minors were specifically adoptable**

We disagree with Mother's and Father's contention that there was no substantial evidence to support the juvenile court's finding that the minors were specifically adoptable.

"Before terminating parental rights, the court must find by clear and convincing evidence that it is likely that the child will be adopted within a reasonable amount of time.  (§ 366.26, subd. (c)(1); [citation].)"  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1290.)

DCFS is required to prepare and file an adoption assessment prior to the section 366.26 hearing to select and implement a permanent plan for the dependent child.  (§§ 361.5, subd. (g)(1), 366.21, subd. (i)(1), 366.22, subd. (c)(1).)  The assessment must include a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent.  (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D).)  "[T]he court, at a hearing held pursuant to this section or anytime thereafter, may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process."  (§ 366.26, subd. (n)(1).)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.  [Citations.]  Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'  [Citations.]"  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)

"It is well established that if a child has special needs which render the child not generally adoptable, a finding of adoptability can nevertheless be upheld if a prospective adoptive family has been identified as willing to adopt the child and the evidence supports the conclusion that it is reasonably likely that the child will in fact be adopted within a reasonable time."  (*In re K.B.*, *supra*, 173 Cal.App.4th at p. 1292.)  "The finding

30

of adoptability is reviewed under the substantial evidence test. [Citation.]" (*Id.*, at p. 1290.)

The evidence supports the juvenile court's findings that the minors were specifically adoptable. Shawna had been identified as willing to adopt the minors and the evidence supported the conclusion that it was reasonably likely the minors would be adopted within a reasonable time. DCFS reported that Shawna, who had had a relationship with the minors since their birth and with whom they had been placed since November 2010, wanted to adopt the minors. DCFS also reported that Shawna had complied with all court orders and case plan activities and that she had been very cooperative and was motivated to complete the home study. Although Mother and Father argue there was no approved home study for Shawna and DCFS had concerns about one of Shawna's adult siblings who resided in the home and had a mental illness diagnosis, "parental rights may be terminated to a specifically adoptable child regardless of whether a home study has been completed." (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1410.) In any event, DCFS reported that the home study was "well underway but not yet completed."

Further, DCFS was scheduled to obtain documentation on the adult sibling who had the mental illness diagnosis. Also, Shawna had stated she was not going to risk the home study being denied because of that adult sibling. Accordingly, the evidence supported the conclusion that it was reasonably likely the minors would be adopted within a reasonable time. (See *In re Brandon T.*, *supra*, 164 Cal.App.4th at p. 1410 [evidence supported finding minor was specifically adoptable where he had been placed in prospective adoptive home for considerable period of time, preliminary assessment was contained in DCFS's section 366.26 report, and nothing in the record suggested obstacles to completion of home study].)

We conclude that substantial evidence supported the juvenile court's findings the minors were specifically adoptable.

31

**D. Substantial evidence supported the juvenile court's order terminating parental rights**

Mother and Father contend that because they established an exception to termination of parental rights in that they had maintained regular visitation and contact with the minors and the minors would benefit from continuing the relationship, the juvenile court erred in terminating parental rights. We disagree.

Once the juvenile court has determined by clear and convincing evidence "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) "Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.] 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574.) If the court finds a compelling reason for determining that termination would be detrimental to the minor, the court shall not terminate parental rights but shall order legal guardianship or long-term foster care for the minor. (§ 366.26, subd. (c)(4)(A).) Section 366.26, subdivision (c)(1)(B) sets forth six circumstances where the court may forgo adoption and retain parental rights. One of the reasons is if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parental relationship must be more than "'frequent and loving contact.'" (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the

32

child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Id*. at pp. 575–576 [substantial evidence supported the juvenile court's order terminating parental rights where relationship was one of friendship and termination would not be detrimental to the minor, who "had been a dependent for three-quarters of her young life and needed a stable, permanent home"].)

"When contesting termination of parental rights under the statutory exception that the parent has maintained regular visitation with the child and the child will benefit from continuing the relationship, the parent has the burden of showing either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child. [Citation.]" (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)

"[T]he juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists, although section 366.26 does contain other exceptions—is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); [citation].) This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

As we explain, we conclude Mother and Father failed to show that the benefit to the minors from continuing their relationship with Mother and Father outweighed the

benefits they would receive from the permanence of being adopted.  Mother and Father appeared to love the minors.  However, while they had a loving relationship with the minors, they did not occupy a parental role in their lives.  Mother and Father did not seem to be able to care properly for them or to control their tempers around them.  On one occasion, Mother had a verbal altercation with Shawna while Father merely looked on.  Mother and Father became angry at Shawna because she refused to let the minors take home junk food that Mother and Father had brought for the minors.  Father yelled at the minors, causing them to not wish to visit him.  Father did not understand the seriousness of the minors' special needs.  Although Father had taken part in a fetal alcohol syndrome support group, he believed fetal alcohol syndrome was a hereditary condition, was in denial of Raymond's diagnosis of fetal alcohol syndrome, and stated at one point that Raymond had been cured.  Mother could not remember Raymond's diagnosis and did not remember when, why, or how old the minors were when they were first removed from her care.  Even though Shawna told Father to bring the minor's home on time, Father kept the minors outdoors later than the scheduled return time, even though exposure to the elements might exacerbate Michael's medical condition.  Neither Mother nor Father appeared to be able to overcome their long-standing alcohol and drug problems in the interests of the minors.

Nevertheless, Mother and Father argue that there is a positive parent-child relationship between them and the minors.  Father argues that he had raised Raymond for the first seven years of his life and Michael for the first three years of his life and that reports prior to September 2012 establish "a real tenderness in connection between the parents and their children."  He also contends that during the two-week extended visit in 2012 and during unmonitored visits, he acted in a parental role by feeding the minors, bathing them, helping them with their homework, and getting them to school.  Mother similarly argues that she helped the minors with their homework, talked to them about school, played games with them, and attended the minors' sports games.  They both argue that the minors referred to Mother as "Mom."

Neither Mother nor Father can show more than frequent and loving contact with the minors in their role as a friendly visitor.  The minors had been involved in the dependency system since Raymond was born.  At the time of the hearing they were 11 and 8 years old.  Yet Mother and Father repeatedly failed to reunify with the minors and Father was unable to understand and handle appropriately the minors' special needs.  Raymond did not remember living with Mother and Father and Raymond's therapist reported that Raymond was upset, quiet, and anxious after visits with Mother and Father.  Although at the hearing both minors expressed sadness at terminating visits with Mother and Father, they also had reported they wanted to live with Shawna, with whom they had bonded and who provided appropriate and adequate care for them in a nurturing environment.

We conclude that Mother and Father failed to show that termination of parental rights would result in a detriment that would outweigh the minors' need for a permanent, stable home.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.